| 3pw253 |
| 186  533 |

3 PW 253
23 SC 198

OF

# *PENNSYLVANIA.*

LANCASTER DISTRICT, ADJOURNED COURT, NOVEMBER, 1831.

## BARTER *against* THE COMMONWEALTH.

The government of every incorporated town, has a right to improve the streets for public purposes, whether as high-ways, or places for cisterns or wells. The practice for the inhabitants to sink wells in the street, is by sufferance, and in subjection to the corporate franchise. The title of the corporation to the soil for uses, that conduce to the public enjoyment and convenience, is paramount and exclusive; and no private occupancy for whatever time, and whether adverse or by permission, can vest a title inconsistent with it.

A bye-law or ordinance of a city corporation, which enacts a penalty for a misdemeanor, with imprisonment, in default of payment, on conviction by the Mayor or an Alderman, is void. The charter of the city of *Lancaster*, does not confer upon the councils, the right to vest in the Mayor and Alderman jurisdiction to convict summarily, or to entertain an action of debt for a penalty. If the charter did give the right to confer a power to imprison on summary conviction, and without appeal to a jury, it would be so far unconstitutional and void.

Jurisdiction is expressly given to the *Mayor's Court*, "for the recovery of fines, forfeitures, penalties, debts and other demands, cognizable in the City Court," the exercise of which, stands clear of all objections on constitutional grounds.

CERTIORARI to *Nathaniel Lightner*, Esquire, Mayor of the city of *Lancaster*. The circumstances of the case were as follows:

Before *Lancaster* was incorporated as a city, or had any regulations respecting wells of water in the public streets, the citizens were in the habit of sinking wells in the streets, so near the side

Note—ROGERS, J.—Was sitting at a *nisi prius* in *Philadelphia* and took no part in the decisions made at this court.

walks, as not to interfere with the right of passage in the streets. *George Kleiss* had a well of this description, sunk by those under whom he claimed his property, many years since. This well was situated in *Vine* street, near the property of said *George Kleiss*, and used by him in his brewery. Sometime in 1827, Dr. *Clarkson Freeman* applied to the Select and Common Councils, to have that well opened as a public well. Dr. *Freeman* having a large tavern house on the opposite side of the street, this well would be of great service to him. The councils passed a resolution to have the well opened, and a pump placed therein, provided, the pump were furnished by individual expense. The pump was furnished, and the mayor issued an order to the street commissioner and high constable, to open said well and place the pump therein. When the pump was put in, *George Kleiss* finding himself injured by it, had it carefully removed and the well again closed. The city councils then, on the 17th of November, 1827, met, and enacted the following ordinance:—

"*An ordinance respecting pumps in the city of Lancaster.*

"Whereas, it is of importance to the citizens of *Lancaster*, that every stream of water, susceptible of improvement, in the said city, should be rendered serviceable, by means of pumps or otherwise, so as to be useful in case of fire—to furnish water to cleanse the streets, and thereby purify the atmosphere, and render the same salubrious and healthy, and in cases, where, in the opinion of the councils, it is necessary to authorize the putting in of pumps in the public streets, it is highly important that the same should be protected from injury and damage:

"Therefore, be it ordained, &c. that in all cases, where a pump has heretofore been put in, or directed to be put in, or shall hereafter be put in any wells of water, in any of the public streets of the city of *Lancaster*, by an ordinance, resolution, or other direction of said councils, no person or persons shall, at any time hereafter, remove, cut down, or wilfully break, injure, destroy, or in any way damage and injure the same, or in any way stop or prevent the same from being used, without the consent of the mayor of the city; and each and every person so offending, shall, on conviction thereof before the mayor, or any of the aldermen, or justices of the peace in the city, be adjudged guilty of a misdemeanor, and to forfeit and pay a fine of one hundred dollars, for each offence, and in case such offender shall neglect or refuse to satisfy such fine, and no goods can be found, whereof to levy the same by distress, he or she shall be committed to the jail or house of correction in this city, for the space of thirty days."

After enacting this ordinance, the mayor gave orders to the

(Barter *v.* The Commonwealth.)

street commisioner and high constable, to open the said well again and place a pump therein, which was done on the 5th of December, 1827, and on the same day *Martin Barter*, the defendant, as the agent of *George Kleiss*, removed and took out the said pump, and on the same day Dr. *Clarkson Freeman*, made the following complaint to the mayor.

*"City of Lancaster, ss.*

"The information of *Clarkson Freeman* of the city of *Lancaster*, Doctor—made and exhibited before me, *Nathaniel Lightner*, mayor of the said city, upon the solemn oath of the said *Clarkson Freeman*, the fifth day of December, Anno Domini, one thousand eight hundred and twenty-seven, who saith, that on the fourth day of December, (the present month,) a certain *Martin Barter*, of the said city, laborer, did wilfully remove, cut down, damage, injure and destroy a certain pump, which the same day had been placed in a well of water, in *Vine* street, near the intersection of *Queen* street, in said city, in pursuance of a resolution of the councils of said city, and did thereby stop and prevent the said pump from being used, contrary to the provisions of an ordinance of the said city of *Lancaster*, passed by the Select and Common Councils of said city, on the 17th of November, 1827, entitled 'an ordinance concerning pumps in the city of *Lancaster*.' "

Whereupon, the mayor issued his precept, and the said *Martin Barter* was brought before him, on the 11th day of December, 1827, and put in the following plea:—

*"Lancaster City, ss.*

"And the defendant in his proper person comes, &c. and for plea in his behalf, states, That the above prosecution ought not further to be sustained against him, because, he says, the said *Nathaniel Lightner*, mayor of the said city of *Lancaster*, has no right, power, authority or jurisdiction to hear, try and determine the said complaint, and inflict the penalty imposed by the said ordinance, because, by the 11th section of the act of assembly, incorporating the city of *Lancaster*, the power of inflicting penalties for the violation of any of the ordinances of said city, is given to the Mayor's Court of said city, neither the constitution nor the legislature of this commonwealth, have in any case, given the mayor, aldermen or justices of the peace, in and for said city, this power and jurisdiction, and neither the mayor, nor any alderman or justice of the peace, in and for the said city, have any power, authority, or jurisdiction, except what is given to them by the constitution and laws of this commonwnalth. They can derive no jurisdiction from an inferior source.

(Barter *v.* The Commonwealth.)

The defendant, therefore, prays judgment of the said mayor, whether he will further sustain their complaint and prosecution aforesaid, and that the said defendant may be discharged therefrom without delay."

Which plea was overruled by the said mayor, who thereupon convicted the said *Martin Barter*, and made the following record of the same:—

"*City of Lancaster, ss.*

"Be it remembred, that on the fifth day of December, in the year of our Lord one thousand eight hundred and twenty-seven, at the city of *Lancaster*, *Clarkson Freeman* of the said city, Doctor, appeared before me, *Nathaniel Lightner*, Esquire, mayor of the said city, and upon his solemn oath, then and there by me administered, gave me, the said mayor, information, that *Martin Barter* of the said city, laborer, did, on the fourth day of the present month, December, wilfully remove, cut down, damage and destroy a certain pump, which the same day had been placed in a well of water in *Vine* street, near the intersection of *Queen* street, in said city, in pursuance of a resolution of the councils of said city, and did thereby stop and prevent the said pump from being used, contrary to the form and provisions of an ordinance of the city of *Lancaster*, passed by the Select and Common Councils of said city, on the seventeenth day of November, one thousand eight hundred and twenty-seven, entitled "an ordinance concerning pumps in the city of *Lancaster*;" and afterwards, upon the eleventh day of December, in the year aforesaid, the said *Martin Barter*, who was previously summoned, in pursuance of my summons for that purpose, to appear before me, the said mayor, upon the said eleventh day of December, at 10 o'clock in the forenoon of that day, at my office in said city, to answer the matter of complaint contained in the said information; the said *Martin Barter* appears before me to answer and make defence to the matter contained in the said information, and having heard the same, for plea saith, that I, the said *Nathaniel Lightner*, mayor, have no right, power, authority or jurisdiction, to hear, try and determine the said complaint, and inflict the penalty imposed by the said ordinance; upon which ground of defence, (after hearing the argument of *Ebenezer Wright*, Esquire, counsel for the said *Martin Barter*,) I, the said mayor, do determine and decide, that I have the power and jurisdiction to hear, try and determine the same.    And then the said *Martin Barter*, for further plea, says he is not guilty of the said offence.    Whereupon, I, the said mayor, do proceed to examine into the truth of the said information, in presence and hearing of the said *Clarkson Freeman*, as of the said *Martin Barter*,

(Barter *v.* The Commonwealth.)

and thereupon, on the same day and year last mentioned, at the city aforesaid, *George Stauffer*, high constable, and *George Brungard*, street commissioner, of said city, creditable witnesses in this behalf, come before me, the said mayor, and are by me, the said mayor severally sworn, and do before me, the said mayor, severally take their corporal oaths, upon the holy gospel of God, to speak the truth, the whole truth and nothing but the truth, of and upon the matters contained in the said information, (I, the said mayor, having sufficient and competent power and authority to administer such oaths,) and the said *Geo. Stauffer*, and the said *Geo. Brungard*, being so sworn, on their said oaths respectively say and depose, in the presence and hearing of the said *Martin Barter*, that they did, on Wendesday the 4th day of December, the present month, with workmen by them employed, (one of them being the said *Martin Barter*,) in compliance with a resolution of the Select and Common Councils of said city, place and put a new pump in a well of water in *Vine* street, near the intersection of *Queen* street, in said city, and on the same day, in about an half hour after the said pump, had been so placed in the said well, they saw the same *Martin Barter*, who is now before the mayor, employed in cutting down the same pump, and saw him cut down, destroy and remove the same, and two other creditable witnesses, to wit:—*William Jordan* and *Robert Porter*, are also produced in this behalf, who are now before me severally sworn, and take their corporal oaths upon the Holy Gospel of God, to speak the truth, the whole truth, and nothing but the truth, of and upon the matters contained in the said information, and the said *William Jordan* and *Robert Porter*, being so sworn on their oaths respectively say, that, on the 4th day of December, the present month, after the said new pump had been placed in the said well, they saw *Martin Barter* with an axe, cut down, and saw him destroy and remove the same pump; and the said *Martin Barter* being asked by me, the said mayor, if he has got or can produce any evidence to contradict the proof aforesaid, he, the said *Martin Barter*, does not produce, nor does he say he can produce any evidence to contradict the same, *nor does he shew me any sufficient cause why he should not be convicted of the premises aforesaid.* WHEREFORE, it manifestly appears to me, the said mayor, that the said *Martin Barter* is guilty of the premises charged upon him, in and by the said information. Therefore, it is considered and adjudged by me, the said mayor, that the said *Martin Barter*, according to the form of the said ordinance of the city of *Lancaster*, be convicted, and he is accordingly by me convicted of the offence charged upon him by the said information, and I do adjudge that the said *Martin Barter*, for the said offence hath forfeited the sum of one hundred dollars, to be paid and distributed as follows: one-third part thereof to the said

33

(Barter *v.* The Commonwealth.)

*Clarkson Freeman*, who gave the information, and the other two-thirds to the treasurer of the city of *Lancaster*, for the use of the mayor, aldermen and citizens of *Lancaster*, agreeably to the provisions of another ordinance, entitled 'an act concerning fines and forfeitures.'

"In witness whereof I, the said *Nathaniel Lightner*, mayor of the city of *Lancaster*, to this record of conviction, as aforesaid, have set my hand and seal, the eleventh day of December, in the year of our Lord, one thousand eight hundred and twenty-seven."

The plaintiff in error assigned the following errors:

1. *George Kleis*, who imployed *Martin Barter*, the defendant, to remove the pump mentioned in the conviction, is the owner of the well in which the said pump was placed, by order of the city councils, and had a brewery furnished from the said well. And said well was dug at the expense of those under whom he claims, and has been used by him and his predecessors, for more than twenty years, and being the private, individual property of the said *George Kleis*, the city of *Lancaster* has no right to the same, nor had the councils any authority to direct the pump to be placed in said well.

2. The ordinances of the 17th of November, 1827, is unconstitutional, illegal and void, and creates an arbitary power, alike hostile and destructive to vested rights and civil liberty.

3. The conviction is erroneous and illegal, inasmuch as it does not follow the ordinance which gave the power to the mayor to convict.

4. The conviction is illegal, the mayor having no power to make it.

The cause was argued by

*W. Hopkins* for the plaintiff in error, who referred to 1 *Burr*, 417. *Commonwealth* v. *McDonald*, 16 *Serg. & Rawle*, 396. The act to incorporate the city of *Lancaster*, § 5, 24. 7 *Penn. Laws*, 95. The constitution of *Pennsylvania*, art. 9, § 6. *Purd.* 25. 14 *Vin.* 343. *Commonwealth* v. *Smith*, 4 *Binn.* 117. *Commonwealth* v. *Reigart*, 14 *Serg. & Rawle*, 216. 1 *Burn's Jus.* 416, 417. And by

*Montgomery* and *Champneys* for the defendant in error. They cited *The Commonwealth* v. *The Judges*, 3 *Binn.* 973. *Eason* v. *Smith*, 8 *Serg. & Rawle*, 343. 2 *Cromp. Pra.* 273. 3 *Black. Com.* 112. *Watson* v. *Mercer*, 17 *Serg. & Rawle*, 343. 2 *Ld. Raym.* 901, 912. 5 *Cowen.* 538. 7 *id.* 349. *Commonwealth* v. *Duquet*, 2 *Yeates*, 493. 2 *Cowen*, 585. The act of the 26th of August, 1721, 1 *Smith*, 130. The act of the 9th of April, 1760. 1 *id.* 227. The act of the the 21st of February, 1767. 1 *id.* 268. *Jacobs L. Dic.* 326, *Tit. Prohibition. Province Laws*, 19, 20. 1 *Wood. Lec.* 495. 3 *Burr*, 1858. 12 *Mod.* 686. *Purd. Dig.* 760. *The Mayor* v. *Mason*, 4 *Dall.* 266. *Cro. Cha.* 178.

The opinion of the court was delivered by

GIBSON, C. J.—That the government of every incorporated town, has a right to improve the streets for public purposes, whether as high ways or places for cisterns or wells, is a proposition about which there can be little dispute.   It is difficult to imagine a subject to which the incidental rights of a municipal corporation, more appropriately extend; and these, where they exist at all, are necessarily exclusive.   It has doubtless been a practice, for the inhabitants to sink wells in the street, at their particular cost, but being beneficial to the public, as well as the individual, and therefore, affording no occasion to contest the right, these have been by sufferance and in subjection to the corporate franchise.   The title of the corporation to the soil, for uses that conduce to the public enjoyment and convenience, is paramount and exclusive; and no private occupancy for whatever time, and whether adverse or by permission, can vest a title inconsistent with it.   The case of the *Commonwealth* v. *McDonald,* by which this salutary principle has been conclusively established, is founded in the purest reason, and fortified by the strongest authorities.   Without, then, attempting to fix the limits of our own power, in respect to prerogative writs, it is sufficient to say that the suggestion of right on which the prohibition is prayed for here, is altogether groundless in fact, so that were we to take the existence of the power for granted, we should certainly not deem the present case a proper one for the exercise of it.   The principal question, therefore, is that which regards the competency of the corporation to make the bye-law on which the defendant has been convicted.

In this bye-law, the mischief to be suppressed is declared a misdemeanor to which a penalty is annexed, with imprisonment in default of payment, on conviction by the mayor or an alderman. No power to commit is given to one of these in the charter, nor is it vested in the corporation, either expressly or by necessary implication, without which, an exercise of legislative authority, such as was assumed in the enactment of the ordinance, may not be supported on the principles of the common or statute law; and for this we have an abundance of authority.   In *Clarke's case,* 5 *Co.* 64, the defendant attempted to justify an imprisonment of the plaintiff, under a bye-law of the town of *St. Albans,* by which it was ordained, that any one who should refuse to pay certain assessments, might be imprisoned; and the plea was adjudged ill.   It was held even that the plaintiff's assent to the ordinance, would not have altered the law, though it was conceded, that a reasonable penalty might have been inflicted.   So a bye-law that an offender shall forfeit forty shillings and be imprisoned in default of payment, has been held ill. 1 *Roll. Abr.* 364; and in the first resolution, in the *King* v. *Clerk,* 1 *Salk.* 349, it was conceded, that a corporation

might have power to commit by custom, but not by charter or bye-law; and the same principle was resolved in *Wood* v. *The Mayor and Commonality of London*, *id.* 370. So too, in the *King* v. *The Merchant Tailors of London*, 2 *Lev.* 200. The foundation of the principle is said, in *Clarke's case*, to be the often quoted provision in *Magna Charta, Nullus liber homo capiatur vel imprisonetur nisi per legale judicium* PARIUM SUORUM, *vel per legem terrae;* the substance of which is secured to us in the Bill of Rights. Now if the charter even purported to confer a power to imprison on summary conviction and without appeal to a jury, it would be so far unconstitutional and void. But it purports to give no such power, being framed on the model of the charter of *Philadelphia*, under which, it is remarkable, that notwithstanding the natural tendency towards excess in every depositary of power, but one ordinance has been passed, which could, by any construction, be made to authorize the enforcement of a penalty by summary conviction. Of the one hundred and sixty-one contained in Mr. *Lowber's* edition of the ordinances, the one passed on the 13th of July, 1809, to punish for removing, injuring or defacing stones or marks placed to regulate the ascent or descent of streets, alone imposes a penalty to be recovered by conviction, before the mayor, recorder or an alderman: *Lowb. Ord.* 228; and the conviction thus spoken of, was probably intended to signify a recovery by action, the word having been used incontestably in that sense, in an ordinance passed the 14th June, 1790, *id.* 124-5. This temperate and guarded use of their powers, is highly creditable to the councils of that city. Admitting then, as seems to have been done by *Lord Mansfield*, in *Hesketh* v. *Braddock*, 3 *Burr.* 1858, that a corporation may provide by its inherent powers, for the recovery of a penalty from its own members by action of debt in its own court, the question occurs, what is the individual jurisdiction of these aldermen, or what, in subordination to the constitution, is the legislative power of this corporation, by the provisions of its charter? By the eighteenth section, the mayor and aldermen are to have the jurisdiction of Justices of the Peace, and subject to the same right of appeal to the common pleas; but this, which is the only jurisdiction that is given to them individually, is insufficient to authorize them to convict summarily, or even to entertain an action of debt for a penalty. *Zeigler* v. *Gram*, 1 *Serg. & Rawle*, 102. If, then, the legislature did not think fit to vest such a jurisdiction, was the corporation competent to vest it? It is proper to remark, that as justices of the peace, the aldermen are not officers of the corporation. In that aspect their duties and jurisdiction are, in their nature and extent, the duties and jurisdiction of the justices in the adjoining townships, and bear exactly the same relation to the government and ordinances of the city. They are corporate officers, only in their character of aldermen, properly so called, or

(Barter *v.* The Commonwealth.)

in other words, judges of the Mayor's Court; and how the corporation can confer a jurisdiction on a justice of the peace, whose functions are independent of it, or even on its own officer, which the legislature has not expressly authorised it to confer, I am unable to imagine. Even were its inherent legislative power extendable to its officer, it could not be extended to the Common Pleas, so as to confer appellate jurisdiction on that court, without which the summary proceeding of the corporate officer would be unconstitutional. No such power was intended to be exercised by it. By the fifth section of the charter, the councils are authorized to make such bye-laws, not being repugnant to any constitutional principle, "as shall be necessary or convenient for the government and welfare of the said city, and the same to enforce, put in use and execution by *constables* or other proper officers." This evidently has reference to executive officers. In addition, the councils are to have the powers that belonged to the government of the place when it was a borough, as well as those that are vested in the Select and Common Councils of *Philadelphia,* none of which relate more specifically to the delegation of judicial authority, than those granted generally in the preceding part of the section. How, then, is the criminal justice of the corporation to be administered? By the eleventh section, it is provided that the mayor and aldermen, shall not only hear and determine crimes and misdemeanors against the laws of the commonwealth, but "also inquire of, hear, try and determine *all* offences, which shall be committed within the said city, against any of the laws, ordinances, regulations or constitutions, that shall be made, ordained and established, in pursuance of this act, and punish the offender or offenders, as by the said laws, ordinances, regulations or constitutions, shall be prescribed or directed;" and in order to do this, they are authorized to hold a court of record, with the jurisdiction of a Court of Quarter Sessions, to inquire of offences against the commonwealth. And by the twenty-fourth section it is directed, that "*for the recovery of fines, forfeitures, penalties, debts* and other demands, cognizable in the city court, *the ordinary forms of law* SHALL BE PURSUED in the process, judgment and several kinds of executions, as if the same were cognizable in the courts of the county." Here, then, is a court of record, to which proceeding by the forms of the common law, jurisdiction is explicitly given, the exercise of which stands clear of all objection on constitutional ground; and to it must be referred the punishment by indictment or penal action, as may be prescribed in the ordinance, of every offence by which a fine, forfeiture or penalty has been incurred in consequence of a breach of the corporation laws. It might perhaps be convenient, to give the aldermen separately, jurisdiction of penal actions, as in other cases of debt, where the amount is the same; but that can be done only

by the legislature. It is, however, not the matter in hand, and we at present decide no more, than that this conviction can not be sustained.

Conviction quashed.